**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | : | |
| | : | **Case No. 2:15-CR-080** |
| **Plaintiff,** | : | **Case No. 2:14-CR-127** |
| | : | |
| **v.** | : | **Judge Algenon L. Marbley** |
| | : | |
| **ROBERT B. LEDBETTER,** *et al.* | : | |
| | : | |
| **Defendants.** | : | |

**OPINION & ORDER**

This matter comes before the Court on Defendant Christopher A. Harris's motion to appear in court without physical restraints during his upcoming trial.  (Doc. 868).[1]  For the reasons that follow, the Court **DENIES** Harris's motion.

**I.  BACKGROUND**

Harris is one of twenty defendants originally indicted for his alleged involvement in the Short North Posse, an alleged criminal organization that operated the Short North area of Columbus, Ohio, from 2005 until 2014.  Harris faces nine charges, including one count of RICO conspiracy, four counts of murder in aid of racketeering, three counts of murder through use of a firearm during and in relation to a drug-trafficking crime, and one count of murder through use of a firearm during and in relation to a crime of violence.  Harris is scheduled to stand trial with the first group of defendants, beginning April 4, 2016 ("Trial I").

---

[1] Lance A. Green filed a substantially similar motion.  (Doc. 879).  In the interest of judicial efficiency, Robert B. Ledbetter (Doc. 872), DeShawn Smith (Doc. 892), and Johnathan Holt (Doc. 898) filed motions seeking to join in Harris's underlying motion to appear without physical restraints.  As explained below, the Court will adjudicate these motions on a trial-by-trial basis, after conducting evidentiary hearings for each trial.  Accordingly, this Opinion and Order pertains only to the five defendants proceeding to trial in the first trial grouping: Ledbetter, Harris, Liston, Ussury, and Robinson.  Although Liston, Ussury, and Robinson did not file motions seeking to appear without physical restraints, they joined in Harris's motion at the Court's evidentiary hearing on March 15, 2016.

On January 27, 2016, this Court issued an Order memorializing a discussion from the January 25, 2016 meeting of the Ad Hoc Committee—a joint defense-prosecution steering committee that has provided guidance throughout this case. (Doc. 841). Among other issues, that Order addressed security measures that the Court is considering for Trial I, including the following passage regarding courtroom security:

> The Marshals Service indicated that all defendants will remain bound by leg-irons for the duration of the trials, although the defendants' hands will remain free once seated. Due to heightened security concerns, the Marshals Service will retain discretion to employ other security measures, including stun belts, for the duration of these trials. Representatives from the General Services Administration and the Court's procurement office pledged to provide suitable skirting for all defense tables to shield the defendants' leg-irons from the jury's view.

(*Id.* at PageID 4064).

On February 5, 2016, Harris filed a motion requesting that he be permitted to appear in court without any physical restraints whatsoever or, alternatively, that he wear a stun belt but no leg-irons. (Doc. 868). Green filed a substantially similar motion on February 10, 2016 (Doc. 879), and several co-defendants subsequently filed requests to join in Harris's underlying motion, (Docs. 872, 892, and 898).

At a Plenary Status Conference held on February 17, 2016, the Court made clear that it had not settled on any particular security measures for Trial I (or the other trials) just yet. Instead, the Court scheduled a hearing involving all five defendants in Trial I and their counsel for March 15, 2016, at which the Court anticipates "hear[ing] testimony and oral argument regarding the need for physical restraints and other courtroom security measures, including, but not limited to, the presence of law-enforcement personnel or other courthouse security officials." (Doc. 909; *see also* Doc. 913 [Scheduling Notice]).

On March 15, 2016, the Court conducted that evidentiary hearing, which lasted roughly two and a half hours. The Court heard testimony from Supervisory Deputy U.S. Marshal Andrew Shadwick, who has served in his present capacity for six years, with roughly eleven years' experience as a Deputy Marshal beforehand. The Court also entertained oral argument.[2]

Mr. Shadwick testified that, based on his training and experience—including overseeing this case from its infancy—he recommended "the highest measure of courtroom security" his agency can provide. In short, he recommended that the defendants be restrained by leg-irons and stun belts during Trial I; that additional security officers be stationed both inside and out of the courtroom; and that a secondary security checkpoint be established just outside the courtroom. He based his recommendations on a variety of factors, including the following: (1) the nature of the allegations in this case—which involve several murders, conspiracy to murder a witness, and witness tampering; (2) the defendants' criminal histories; (3) the large number of defendants standing trial together; (4) the lengthy prison sentences the defendants face if convicted; (5) the defendants' purported gang affiliation and their history of poor relations with law-enforcement officials; (6) one instance of noncompliance with verbal commands from law-enforcement officials while three of the defendants were being transported to a recent *Daubert* hearing; and (7) various incidents of violence, threatened violence, and potential escape from the defendants' current facility of detention—the Delaware County Jail. Mr. Shadwick also testified that, in his estimate, a "belt and suspenders" approach—*i.e.*, employing both leg-irons and stun belts—was warranted to guarantee courtroom security, but that his agency would employ mitigating measures to reduce any prejudice against the defendants, including table skirting, noise mufflers, and strict protocol for jury entrance and exit.

---

[2] The defendants presented no evidence (aside from cross-examining Mr. Shadwick) to support their argument against the use of physical restraints.

## II.  LEGAL STANDARDS

The use of physical restraints at trial implicates a defendant's right to due process of law. *Deck v. Missouri*, 544 U.S. 622, 629 (2005).  Therefore, before a trial court may allow physical restraints that are "visible to the jury," the court must make a determination, "in the exercise of its discretion, that they are justified by a state interest specific to a particular trial."  *Id.*  This determination may "take into account the factors that courts have traditionally relied on in gauging potential security problems and the risk of escape at trial."  *Id.*  Nevertheless, the inquiry "must be case specific," in that "it should reflect particular concerns, [such as] special security needs or escape risks, related to the defendant on trial."  *Id.* at 633.  This rule applies to traditional forms of restraints, such as shackles and leg-irons, as well as to more modern forms of restraints, such as stun belts.  *See Lakin v. Stine*, 431 F.3d 959, 963-64 (6th Cir. 2005) (discussing use of leg-irons); *United States v. Miller*, 531 F.3d 340, 344-45 (6th Cir. 2008) (discussing use of stun belts).

Prior to making this individualized determination, the Sixth Circuit prefers that trial courts convene a formal hearing so that the evidence supporting their decision can be made part of the record.  *United States v. Perry*, 401 F. App'x 56, 64 (6th Cir. 2010) ("[W]e repeat here that a district court is to conduct a hearing and create a record of its findings as to why physical restraints during trial are necessary. . . . [Even] [i]f there is no objection by the defense, the government . . . should remind the judge to conduct a hearing on the reasons for restraining the defendants."); *see also Miller*, 531 F.3d at 345 (agreeing that trial court erred in permitting physical restraints without first conducting an evidentiary hearing or receiving any evidence).  *But see Deck*, 544 U.S. at 635 (implying that there may be "an exceptional case where the record itself makes clear that there are indisputably good reasons for shackling").

In determining whether to approve the use of physical restraints, district courts should consider several factors, including the following: "(1) the defendant's record, his temperament, and the desperateness of his situation; (2) the state of both the courtroom and the courthouse; (3) the defendant's physical condition; and (4) whether there is a less prejudicial but adequate means of providing security." *Lakin*, 431 F.3d at 964; *see also United States v. Waagner*, 104 F. App'x 521, 526 (6th Cir. 2004) (same); *accord Deck*, 544 U.S. at 628 (explaining that the right to be free from physical restraints is not absolute and can be overcome by such interests as "physical security, escape prevention, or courtroom decorum"). District courts may confer with the United States Marshals Service or corrections officers in deciding whether physical restraints are warranted in a particular case because those officers' opinions may be "highly relevant." *Lakin*, 431 F.3d at 964. But district courts abuse their discretion by simply deferring to the officers' recommendations without first engaging in the required individualized inquiry. *Id.*; *see also Miller*, 531 F.3d at 346 ("We have held previously that a district court's blind adherence to a corrections officer's recommendation, without making any individualized determinations or specific findings, amounts to an abuse of discretion.").

## III. ANALYSIS

Given the gravity of the defendants' alleged crimes, the nature of the defendants' past convictions, the desperateness of the defendants' situations, the state of the reconfigured courtroom and the courthouse more generally, the defendants' excellent physical conditions, and the lack of less prejudicial but adequate means of providing security—the Court **DENIES** Harris's motion to appear without physical restraints. As explained below, the Court will allow the Marshals Service to use both leg-irons and stun belts on all five defendants in Trial I, provided adequate safeguards are employed to minimize the risk of any prejudice.

**A.  The Factors Unique to Each Defendant Counsel in Favor of Physical Restraints.**

The Sixth Circuit has identified two factors to consider when making physical-restraint decisions that apply to each of the five defendants individually: (1) "the defendant's record, his temperament, and the desperateness of his situation"; and (2) "the defendant's physical condition."  *See Lakin*, 431 F.3d at 964 (citing *Kennedy v. Cardwell*, 487 F.2d 101, 108-09 (6th Cir. 1973)).  Viewed on a defendant-by-defendant basis, these factors counsel in favor of employing leg-irons and stun belts for all five defendants in Trial I.

*1. Robert B. Ledbetter*

Ledbetter is currently serving a federal sentence for drug trafficking.  In this case, the Government charged Ledbetter with one count of racketeering conspiracy; seven substantive murder counts, including four counts of murder in aid of racketeering, two counts of murder through the use of a firearm during and in relation to a drug-trafficking crime, and one count of conspiracy to murder a witness; and one count of the use of a firearm during and in relation to a crime of violence—namely, witness tampering.  Ledbetter allegedly participated in eight overt acts in furtherance of the alleged RICO conspiracy.  Those crimes include attempted murder, solicitation of murder, solicitation to prevent a witness from providing information to law enforcement, and various drug and firearm offenses.  Ledbetter faces a potential sentence of life imprisonment without the possibility of release under the relevant statutes.  Moreover, he is a young man (in his mid-thirties) in excellent physical condition, and thus seems capable of the following: escape, overpowering others, and inflicting harm on others attempting to subdue him.  Put simply, his record, the desperateness of his situation, and his physical condition all counsel in favor of allowing physical restraints so as to prevent any violence or possibility of escape.

The Court notes that Ledbetter has been a "model citizen" while in the courtroom during each of his pretrial appearances, suggesting an even-handed temperament. Nevertheless, the Court cannot ignore that several of the allegations levied against Ledbetter bear directly on the integrity of the judicial process and the safety of trial participants. Conspiracy to murder a witness and witness tampering are serious allegations—as serious as they come insofar as protecting the judicial process. The Court remains duty-bound to consider those allegations in assessing the need for enhanced courtroom security measures, and the allegations lend weight to the Marshals Service's recommendations.

*2. Christopher A. Harris*

Harris is currently serving a state sentence for aggravated burglary and gross sexual imposition. The Government has charged Harris with one count of racketeering conspiracy and eight substantive murder counts, including four counts of murder in aid of racketeering and four counts of murder through the use of a firearm during and in relation to a crime of violence or a drug-trafficking crime. Harris allegedly participated in fourteen overt acts in furtherance of the alleged RICO conspiracy. Those crimes include attempted murder, robbery, threatening police officers, and various drug and firearm offenses. Harris too faces a potential sentence of life imprisonment without the possibility of release under the relevant statutes. Like Ledbetter, Harris is a young man (in his late-twenties) in excellent physical condition, and thus seems able to resist being subdued or to initiate a possible escape. *See Kennedy*, 487 F.2d at 111 (asking whether "the physical condition of the defendant [is] such as to reduce or eliminate the likelihood of escape or acts of violence"). Here again, Harris's record, the desperateness of his situation, and his physical condition all counsel in favor of allowing physical restraints.

7

The Court notes that Harris has been a "model citizen" while in the courtroom during each of his pretrial appearances, suggesting an even-handed temperament.  But as the Sixth Circuit has concluded, trial courts are not restricted to considering a defendant's behavior "at the time of trial" when making security-measure determinations.  *Id.* (citing *Loux v. United States*, 389 F.2d 911, 919-20 (9th Cir. 1968)).  The allegations of murder, attempted murder, and threatening police officers all counsel in favor of employing both leg-irons and stun belts.

### 3. Rashad A. Liston

Liston is currently serving a state sentence for murder.  The Government has charged Liston with one count of racketeering conspiracy and six substantive murder counts, including three counts of murder in aid of racketeering and three counts of murder through the use of a firearm during and in relation to a drug-trafficking crime.  Liston allegedly participated in six overt acts in furtherance of the alleged RICO conspiracy, including murder, attempted murder, and robbery.  Liston also faces a potential life sentence without the possibility of release under the relevant statutes.  Liston, who is in his late-twenties, also is in peak physical condition, and thus seems able to inflict violence on others if they attempt to subdue him or to initiate a possible escape.  Liston's record, the desperateness of his situation, and his physical condition militate in favor of allowing physical restraints.

Liston too has been a "model citizen" while in the courtroom for his pretrial appearances, thus suggesting an even-handed temperament.  But Mr. Shadwick testified that Liston recently plotted with one of his co-defendants (from a later trial grouping) to harm prison officials by shaping a piece of tile into a weapon.  The county sheriff's office investigated the plot and uncovered the piece of tile in question in one of the defendants' prison cells.  This allegation underscores the need for heightened security measures with respect to Liston.

#### *4. Deounte Ussury*

Ussury is currently serving a federal sentence for drug-trafficking and firearm offenses. The Government has charged Ussury with one count of racketeering conspiracy and five substantive murder counts, including three counts of murder in aid of racketeering and two counts of murder through the use of a firearm during and in relation to a drug-trafficking crime. Ussury allegedly participated in six overt acts in furtherance of the alleged RICO conspiracy. Those crimes include attempted murder and various drug and firearm offenses.  Ussury faces a potential sentence of life imprisonment without the possibility of release under the relevant statutes.  Ussury remains in his early-thirties, and is in excellent physical condition to resist being subdued or to initiate a potential escape.  Once more, Ussury's record, the desperateness of his situation, and his physical condition all counsel in favor of allowing physical restraints.

Ussury has been a "model citizen" during all pretrial appearances, thus suggesting an even-handed temperament.  But Ussury also has shown a propensity for violence and an inability to comply with law-enforcement commands.  Mr. Shadwick testified that Ussury was one of three defendants who refused to comply with verbal commands during the lead-up to the Court's March 3, 2016 *Daubert* hearings.  Mr. Shadwick noted that Ussury and two other defendants (Harris and Ledbetter) acted out when officers informed them of the clothing they would be wearing to court that day and refused, initially, to comply with the officers' verbal directives. Mr. Shadwick further testified that, in his experience, an inability to follow verbal commands could prove problematic for maintaining security during trial since his officers are trained to use an escalation-of-force approach to any confrontation or outbursts that begins with verbal commands.  These factors weigh in favor of employing heightened security measures with respect to Ussury as well.

*5. Clifford L. Robinson*

Robinson remains detained pending trial in this case, in which the Government has charged him with two substantive murder counts: one count of murder in aid of racketeering and one count of murder through use of a firearm during an in relation to a crime of violence. Robinson faces a potential sentence of life imprisonment without the possibility of release. Although Robinson is the oldest of the five defendants proceeding to trial in Trial I, he too is comparatively young (in his mid-thirties) and appears to be in fine physical condition to resist being subdued or to initiate a potential escape. These factors counsel in favor of allowing physical restraints, particularly so when coupled with consideration of the "trial-wide" factors, discussed in more detail below.

Like his co-defendants, Robinson has been a "model citizen" during all pretrial appearances. Nevertheless, this factor, standing alone, does not negate the seriousness of the allegations he faces, or the seriousness of his potential sentence. Moreover, Mr. Shadwick testified that prison officials recently discovered a paperclip that had been manipulated into a potential handcuff key under the mattress in an empty cell next to Robinson's cell. This allegation suggests that Robinson may have been contemplating an escape and again counsels in favor of requiring him to wear both leg-irons and stun belts at trial.

**B. The Factors Common to all Defendants Counsel in Favor of Physical Restraints.**

In addition to the defendant-specific factors discussed above, the Sixth Circuit instructs district courts to consider two factors that apply with equal force to all five defendants in Trial I: (1) "the state of both the courtroom and the courthouse"; and (2) "whether there is a less prejudicial but adequate means of providing security." *Lakin*, 431 F.3d at 964. These factors counsel in favor of requiring leg-irons and stun belts for all five defendants in Trial I.

*1. The State of the Courtroom and the Courthouse Warrant Physical Restraints.*

The reconfigured state of the courtroom, and the state of the courthouse more generally, both weigh in favor of allowing physical restraints in Trial I. The Court notes that, with five defendants standing trial, and a total of nine defense attorneys representing them, the well of the courtroom will be exceedingly crowded under its reconfigured layout. The defendants will be in much closer proximity to other trial participants than in a typical case. Indeed, the defendants will be within just a few feet of the prosecutors who are trying this case (when at the lectern), and just a few strides further from the witnesses who will testify against them, the judge who will preside over their trial, and the jurors who ultimately will decide their fate. Moreover, during sidebars, one of the defendants (Ussury) will be within just a few feet of the attorneys, the court reporter, the law clerk, opposing counsel, and the judge. This reconfigured layout also will hamper the movement of security personnel stationed in the courtroom. The Court anticipates that several co-conspirators will testify against the defendants, further exacerbating tensions and providing increased risk of a potential outburst or altercation if the defendants are not restrained. And, during the trial, there will be five defendants in the courtroom each day, a fact worth highlighting because they are accused of committing violent crimes (including murder and witness tampering) in concert with each other and others associated with the Short North Posse. Reasonable physical restraints will quell many of these risks.

Looking to the state of the courthouse more generally, the Court notes that security personnel will be substantially burdened by this trial's length (eleven weeks), media interest, and the large number of trial observers. Allowing reasonable physical restraints, calibrated to the precise threat of violence or potential escape, will enable those security personnel to maintain safety and security not just in this trial, but also throughout the courthouse more generally.

### 2. *There Is no Less Prejudicial but Adequate Means of Providing Security.*

There is no less prejudicial but adequate means of providing security. The gravity of the defendants' alleged crimes, in addition to the defendants' past convictions, shows that leg-irons and stun belts are warranted. Harris's proposed alternatives—involving additional security personnel or stun belts only—lack practicality and safety.[3] As noted, courthouse security will be stretched thin given the size, scope, and duration of this trial, not to mention other courthouse business. Furthermore, restraints (including leg-irons) provide a degree of safety simply not available through other means, including the use of stun belts alone. With just a few feet separating the defendants from the rest of the trial participants, timing and inches matter. Mr. Shadwick testified that an eight-second delay occurs between trigger and activation on the stun belts, and the Court notes that the defendants could travel some distance during those eight seconds if not restrained by leg-irons. Mr. Shadwick also testified that some detainees might have a higher pain tolerance and thus might be able to fight through activation of their stun belts. The Court takes these concerns seriously and, upon advice of the Marshals Service, concludes that a combination of leg-irons and stun belts is the only adequate means of ensuring security.

In sum, the defendants' "individual criminal histories, including many violent crimes, the violent crimes for which they were in fact indicted, the sheer number of defendants on trial, and the fact that each of the defendants had a full opportunity to respond to the court's concerns and raise alternative proposals" all show that the combination of leg-irons and stun belts is warranted in Trial I. *See United States v. Baker*, 432 F.3d 1189, 1245-46 (11th Cir. 2005), *abrogated on other grounds by Davis v. Washington*, 547 U.S. 813, 821 (2006).

---

[3] Ledbetter, Ussury, and Robinson joined in Harris's suggested approach. Liston, in contrast, argued for stun belts only due to an apparent fear of getting shocked. Both arguments miss the larger point underlying the Marshals Service's recommendation—*i.e.*, that a combination of *both* forms of physical restraints are required to *guarantee* the safety, security, and decorum of the courtroom.

**C. The Court Will Take Steps to Minimize any Prejudice from the Physical Restraints.**

Although the use of physical restraints is warranted, the Court will make every effort to eliminate the jury's awareness of those restraints so as to minimize the risk of prejudice. *See United States v. Orris*, 86 F. App'x 82, 86 (6th Cir. 2004) (holding that while district court "should have more clearly stated on the record" why physical restraints were warranted, reversal was not appropriate because "there [was] no indication . . . that shackling prevented Orris from consulting with his attorney, was ever seen by the jury, or otherwise prejudiced [him]").

The defendants will be required to wear leg-irons and stun belts, which will not be plainly visible to the jury. *See Deck*, 544 U.S. at 624 (limiting its holding to use of "visible shackles"); *Miller*, 531 F.3d at 347 (finding no prejudice where restraints were not visible). Indeed, the stun belts will be worn underneath the defendants' clothing to minimize any risk of prejudice, *Stevens v. McBride*, 489 F.3d 883, 899 (7th Cir. 2007), and the leg-irons will be muffled by electrical-tape wrapping to prevent them from making noise when the defendants stand up, sit down, or shuffle in their seats, *Baker*, 432 F.3d at 1241. The Court will ensure that table skirting shields the leg-irons from the jury's view to the extent practicable, *see Orris*, 86 F. App'x at 86, and the skirting will be placed around the Government's table and along the railing separating the gallery from the courtroom well too, so as to avoid unwanted focus on the defendants' tables, *see Baker*, 432 F.3d at 1241. The defendants will be escorted into the courtroom before the jurors take their seats, and they will leave the courtroom after the jury has departed, further reducing any opportunity to see the restraints. *Id.* Finally, the defendants' hands will remain free so that the defendants may "participate in [their] own defense" by taking notes or bringing matters to their attorneys' attention. *See Waagner*, 104 F. App'x at 525; *see also Orris*, 86 F. App'x at 86. Together, these precautions will lessen any prejudice to the defendants.

**D.  The Court Will Allow the Defendants to Testify <u>Without</u> Wearing Leg-Irons.**

During the March 15, 2016 evidentiary hearing, counsel for several defendants raised special concerns over the use of leg-irons should their clients elect to testify in their own defense. As defense counsel pointed out, and as the Court agrees, the witness stand remains plainly visible in the front to both the jury and the gallery.  Accordingly, *if* the defendants remained bound by leg-irons while testifying, the jury would see their leg-irons, as well as the spectacle of the defendants "hobbling up" to the witness stand, potentially prejudicing their defense.  Defense counsel's point is well taken.  Accordingly, the Court will relax the security measures outlined above in the following manner: (1) if any defendant opts to testify, the Court will excuse the jury from the courtroom before that defendant takes the stand; (2) the Marshals Service will then remove that defendant's leg-irons for the duration of his testimony; and (3) when the defendant finishes testifying, the Court will excuse the jury from the courtroom again before the defendant returns to his table, at which point his leg-irons will be replaced.

**E.  The Court Will Employ Other Security Measures for Trial I.**

In addition to the physical restraints discussed above, the Court will employ other security measures during Trial I.  These measures include operating a secondary security checkpoint just outside of the courtroom's main entry; requiring gallery members to leave their cellphones at this secondary security checkpoint to gain entrance to the courtroom; requiring all gallery members to provide a photo ID at the secondary checkpoint; and permitting the Marshals Service to control seating arrangements for the victims, their family members, and the family members of the defendants.  (*See* Doc. 841 at PageID 4064).  The Court finds these additional security measures necessary due to outbursts, incidents of harassment, and improper in-court photography that have occurred during several pre-trial hearings and proceedings in this case.

Finally, the Court will authorize the use of additional courtroom security personnel, including Court Security Officers and personnel from the Marshals Service. The use of courtroom security personnel does not raise the same type of constitutional concerns as does the use of physical restraints. *See Holbrook v. Flynn*, 475 U.S. 568-69 (1986). Accordingly, the same type of individualized justification is not required. *Id.* Indeed, the Sixth Circuit encourages the use of security personnel to protect courtroom security and decorum. *See Lakin*, 431 F.3d at 964 ("Since guards can be strategically placed in the courtroom when more than normal security is needed and can be hidden in plainclothes, the jury never need be aware of the added protection so that no prejudice would adhere to the defendant." (quoting *Kennedy*, 487 F.2d at 109-09)); *cf. Holbrook*, 475 U.S. at 569 ("[T]he presence of guards at a defendant's trial need not be interpreted as a sign that he is particularly dangerous or culpable. . . . Indeed, it is entirely possible that jurors will not infer anything at all from the presence of the guards.").

## IV.  CONCLUSION

For these reasons, the Court **DENIES** Harris's motion to appear without physical restraints (Doc. 868). During Trial I, the Court will require the use of leg-irons and stun belts on all five defendants, coupled with the cautionary measures and additional security protocols described above. Ledbetter's motion seeking to join in Harris's underlying motion (Doc. 872) is **GRANTED but MOOT**. Although not necessary, Harris filed an identical motion (Doc. 49) on the Court's docket in Joined Case No. 2:15-cr-080. That motion likewise is **DENIED.**

**IT IS SO ORDERED.**

    **s/ Algenon L. Marbley**
**ALGENON L. MARBLEY**
**UNITED STATES DISTRICT JUDGE**

**DATED:  March 18, 2016**